Filed 5/1/25  P. v. McKinney CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C097572 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2019-16711) |
| v. | |
| NATHANIEL JERMAINE MCKINNEY, | |
| Defendant and Appellant. | |

A jury convicted defendant Nathaniel Jermaine McKinney of committing various sex offenses against his daughter when she was 13 years old.  He was sentenced to 15 years to life in state prison.  On appeal, McKinney seeks reversal of his convictions, claiming that the prosecutor prejudicially mischaracterized the DNA evidence in closing argument and that the trial court erred by failing to sua sponte instruct the jury on certain assertedly lesser included offenses.  McKinney also challenges his sentence, contending, among other things, that he was constructively denied the assistance of counsel.  Finding no prosecutorial or instructional error, we affirm the convictions.  We further conclude that a remand for resentencing is unwarranted on the present record.

1

BACKGROUND

McKinney was charged with forcible rape of a child (Pen. Code, § 264, subd. (c)(1); count 1), lewd acts upon a child (§ 288, subd. (a); count 2), and aggravated sexual assault of a child who is under age 14 and seven or more years younger than the perpetrator (§ 269, subd. (a)(1); count 3).[1] Various defense attorneys were appointed and relieved over the course of the pretrial proceedings. Ultimately, McKinney represented himself at trial.

At trial, the victim testified that McKinney, her father, raped her at his apartment one night in November 2019 when she was 13 years old. The victim reported the assault to law enforcement, and she underwent a Sexual Assault Response Team (SART) examination approximately three days after the assault occurred.

During the SART exam, the nurse took two sets of swabs of multiple parts of the victim's body to collect potential physical evidence for DNA testing. The nurse additionally obtained reference buccal swabs from the inside of the victim's cheek. She also collected for DNA testing the underwear the victim wore to the exam. After the exam, law enforcement collected a pair of black pajama pants that the victim reportedly wore the night of the assault. Law enforcement also obtained a reference buccal swab from McKinney.

The underwear, pajama pants, and evidentiary swabs were tested and analyzed at a California Department of Justice laboratory. The testing revealed sperm on one of the swabs of the victim's mons pubis as well as on the crotch of both the pajama pants and underwear.

The criminalist who performed the DNA analysis was designated as an expert and testified about the results of the testing. Using a technique called differential extraction,

---

[1] Undesignated statutory references are to the Penal Code.

2

the expert separated the mons pubis DNA sample into a "sperm fraction" and a "non-sperm fraction." The sperm fraction of the mons pubis swab contained DNA from two contributors, one male and one female. When the expert uploaded the male DNA profile to the Combined DNA Indexing System database, it revealed McKinney as a match.

The expert also used a probabilistic genotyping software program to compare the DNA from the mons pubis swab to the DNA from McKinney's reference buccal swab. He testified that probabilistic genotyping shows whether a person can be excluded as a contributor to a given sample, and, if he or she cannot be excluded, gives a "likelihood ratio[]" for how likely it is that the person is a DNA contributor. The likelihood ratio statistics correlate to the rarity of certain DNA variations in the population. The higher the ratio, the more likely it is that the person's DNA is in the sample.

For the sperm fraction of the mons pubis swab, having determined there was DNA from one male and one female, the expert was able to assume that the female contributor was the victim herself. Given those inputs, the genotyping software program reported that it was 81 quadrillion times more likely that the male DNA belonged to McKinney than to an unknown person. In the language of the program, this was "very strong support" that McKinney was the other contributor.

The DNA expert also performed differential extractions and probabilistic genotyping on the pajama pants and underwear. For the pajama pants, the expert again determined that the sperm fraction of the sample contained DNA from two contributors. This time, however, it could not be assumed that one of the contributors was the victim, so the program provided several likelihood ratios. It was 26 sextillion times more likely that the DNA mixture was from McKinney and one unknown person instead of from two unknown people. It was 1.2 septillion times more likely that the DNA mixture was from McKinney and the victim instead of from two unknown people. And it was 31 sextillion times more likely that the DNA mixture was from McKinney and the victim instead of from an unknown person and the victim.

3

Finally, the DNA expert described the results for the sperm fraction of the underwear sample. This sample likewise contained two contributors, neither of whose identity could be assumed automatically. The program returned the following likelihood ratios: that it was 330 billion times more likely that the DNA mixture was from the victim and one unknown person instead of from two unknown people; that it was 2.2 sextillion times more likely that the DNA mixture was from McKinney and one unknown person instead of from two unknown people; and that it was 730 nonillion times more likely that the DNA mixture was from the victim and McKinney instead of from two unknown people. Again, this was "very strong support" for McKinney and the victim being contributors. When the victim was assumed to be a contributor, it became 2.5 sextillion times more likely that McKinney was the other contributor rather than an unknown person.

On cross-examination, McKinney asked the DNA expert whether it was hypothetically possible for DNA to be contributed by rubbing two items together. The expert answered that "it depends" and that "in a science realm, we always say yeah, anything's possible. But is it likely and is it probable?" Then, at the end of his cross-examination, McKinney asked the expert whether the DNA was "arguable" and whether there was "a chance the DNA test could be wrong." The expert responded, "I mean, you can make that point. You can argue it. I mean, that's up to you I guess."

In presenting his defense, McKinney called six character witnesses. In general, they testified that McKinney was a good father who had a good relationship with all of his children. They stated that prior to this case, they had never heard of any allegations of physical or sexual abuse by McKinney against any of his children. McKinney also testified on his own behalf. He denied all guilt, claiming the sperm found on the victim and the clothing was not his.

The jury found McKinney guilty on all three counts. In a bifurcated proceeding, the jury found true two aggravating circumstances for counts 1 and 2: that the victim was

4

particularly vulnerable and that McKinney took advantage of a position of trust or confidence to commit the offenses. (Cal. Rules of Court, rule 4.421(a)(3) & (11).) The jury found not true a third aggravating circumstance that the crimes involved great violence. (Cal. Rules of Court, rule 4.421(a)(1).)

In March 2022, two months after the verdicts were received, the trial court appointed counsel for McKinney. In November 2022, after a series of continuances, counsel filed a motion for a new trial challenging the admission of uncharged misconduct evidence. The trial court set a December hearing to decide the motion and for sentencing, if appropriate. At the hearing, the court heard extensive argument on the motion for a new trial, denied the motion, and then proceeded immediately to sentencing. The court sentenced McKinney to a prison term of 15 years to life for the aggravated sexual assault conviction. It also imposed, but stayed pursuant to section 654, upper term sentences of 13 years for the forcible rape conviction and eight years for the lewd acts conviction.

McKinney filed a timely notice of appeal.

DISCUSSION

I.

McKinney first argues that the prosecutor prejudicially erred by misstating the DNA probability evidence in his closing remarks. As part of his closing argument, the prosecutor said:

"The defendant has basically told you that you should ignore science; that you should say that that is not his semen on her mons pubis; that is not semen on the panties that she wore to the SART exam; and it is not his semen on the pajamas.

"And he's basically asking you to say, you know, gravity doesn't exist. If you jump out that plane, you're just going to continue to fly and the earth is going to pull you down and you're not going to die after jumping 30,000 feet out of a plane. I'm sorry, but when—we're talking about numbers so large they dwarf the number of people currently

5

in existence on this earth. We're talking 81 quadrillion. That is the likelihood ratio that it could be somebody else other than Mr. Mckinney's DNA in the sperm section on her vagina.

"That is what Mr. Mckinney's asking you to say; to say no, that's wrong. It's somebody else. It wasn't me. It's not mine. That is what he's asking you to make a determination on. *And that's frankly not possible.*

"And it's not just 81 quadrillion in the mons pubis swab. We then have to go to the other reports about what is found. We have to also say that, okay, the 81 quadrillion, we have to throw that out as well. We also have to throw out the pajama pants. And it's always in the crotch area. It's always in the crotch area. The sperm fraction from the pajama pants, we're also going to have to say that it's not his semen as well to a factor or ratio of 1 to 31 sextillion. That's even more than the mons pubis.

"And we also have to say that the sperm fraction from the crotch area of the underwear is someone else other than Mr. Mckinney, again to 2.5 sextillion.

"So I'm glad that we had [the DNA expert]. Because there is no way I would be able to know how many zeros we're talking about with this particular number. Quadrillion—and this is 81 quadrillion—that's 15 [zeros]. That's 10 to the 15 power. And sextillion, 2.5 sextillion. Sextillion is 21 zeros. And the pajama pants, 31 sextillion. That's again 21 zeros.

"And it gets even more—as the hypotheses start to unfold and you saw them and we went over them, they get even more compelling as the number just gets larger and larger. We have 730 nonillion to say that the DNA that's found on the pajama pants— sorry. Not the pajama pants. The underwear is two unknown persons. Not [the victim]'s and not defendant's. It's a giant number.

"In nonillion we're talking about 30 zeros. *That's simply not possible.* And the defendant's asking you to go with *not possible*. *Scientifically not possible.* That's what he's asking you to say and determine in this particular case." (Italics added.)

6

McKinney contends that the italicized arguments misstated the evidence because the DNA expert did not testify that it was, in fact, impossible for the sperm DNA on the victim's body and clothing to have come from someone other than McKinney. A prosecutor "enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom," but "engages in misconduct by misstating facts." (*People v. Hamilton* (2009) 45 Cal.4th 863, 928.) A defendant's failure to object to a prosecutor's statements during trial generally forfeits a claim of prosecutorial error for misstating the evidence. (See *People v. Lucas* (1995) 12 Cal.4th 415, 473 (*Lucas*).)

McKinney acknowledges that he asserted no objection to the prosecution's closing argument but argues that his challenge is properly presented because an admonition would not have cured the error. (See *Lucas*, *supra*, 12 Cal.4th at p. 473 [recognizing exception to general forfeiture rule when "harm could not have been cured by a prompt objection and admonition to the jury"].) We disagree because a timely objection and admonition could have remedied the harm McKinney claims resulted from the prosecutor's references to impossibility. Had McKinney voiced his current objection at trial, the trial court could have instructed the jury in the moment that attorney arguments were not evidence and that the jury's determination of the facts in evidence controls. McKinney's claim is therefore forfeited. (See *Lucas*, at p. 473.)

In any event, McKinney's claim also fails on the merits. (See *Lucas*, *supra*, 12 Cal.4th at pp. 473-474 [addressing merits despite finding forfeiture of prosecutorial error argument]; *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [appellate courts have discretion to reach unpreserved questions].) The prosecutor's handful of references to impossibility, when read alongside his accompanying emphasis on the likelihood ratios themselves, do not reflect prosecutorial error. The prosecutor did not argue that it was scientifically impossible for the DNA to belong to anyone other than McKinney, full stop. Instead, the prosecutor's four statements that McKinney's DNA argument was "not

7

possible" were preceded by discussion of the ratios themselves. That discussion accurately reminded the jury of the expert's testimony concerning the extraordinarily high likelihood that McKinney contributed DNA to the samples taken—for instance, 81 quadrillion to one for the DNA on the victim's mons pubis, 31 sextillion to one for the DNA on the pajamas, and as much as 730 nonillion to one for the DNA on the underwear. As the prosecutor informed the jury in his summation, these are all "numbers so large they dwarf the number of people currently in existence on this earth." Thus, far from mischaracterizing the expert's testimony, the prosecutor's argument asked the jury to draw the permissible inference from those ratios that McKinney must have contributed DNA to the mixtures found on the victim and on her clothing. Furthermore, after closing arguments, the jury was ultimately instructed that attorney arguments were not evidence, a point the prosecutor himself emphasized at the start of his remarks when he stated that he was not a witness and was not testifying. (See *Lucas*, at p. 474 [cautionary instruction supports rejection of claim of prosecutorial error].)

McKinney emphasizes that the DNA expert also testified on cross-examination that "DNA transfer was 'possible' " and that "[w]rong DNA was arguable," but those statements did not detract from the expert's testimony concerning the extraordinarily high probability of a match. In response to McKinney's questions, the DNA expert allowed that "anything's possible" in the scientific realm and that McKinney was free to advance whatever argument he pleased. These were general statements acknowledging remote possibilities and McKinney's undisputed right to challenge the test conclusions—not concessions that the statistical evidence of near-certainty was in doubt.

The degree of certainty established by the data presented in this case distinguishes it from *People v. Hill* (1998) 17 Cal.4th 800, on which McKinney relies. In that case, our state Supreme Court held that a prosecutor committed misconduct by, among other things, suggesting in closing argument that the jury could confidently conclude that the blood found on the murder weapon was the victim's when, in fact, the testimony reflected

8

that the blood was consistent with 48 percent of the population. (*Id.* at pp. 823-825.) The court faulted the prosecutor for "mischaracterizing the nature of the evidence" "by suggesting the serological evidence pointed unerringly to [the] defendant's guilt of stabbing [the victim], whereas the actual evidence was much less damning." (*Id.* at p. 825.) The problem lay in the prosecutor "falsely asserting the serological evidence was more inculpatory tha[n] it actually was." (*Ibid.*) The prosecutor made no similar false assertion here. As we have noted, the DNA likelihood ratios were so high that the prosecutor could properly ask the jury to draw a reasonable inference that it was, in essence, certain that McKinney was the male contributor to the samples.

In that regard, this case is like *Lucas*, *supra*, 12 Cal.4th 415, in which the California Supreme Court found no error in the prosecutor's closing discussion of serological evidence. In *Lucas*, an expert criminalist testified that, among other things, only ".000047 percent of the population ha[d] blood with genetic markers consistent with [the] defendant's" and that blood on a shirt and paper towel found at the crime scene was consistent with the defendant's blood (but not either victim's). (*Id.* at pp. 471-472.) In closing argument, the prosecutor argued that the paper towel had the defendant's blood on it, " 'for sure a hundred percent' " and the blood on the shirt " 'is the defendant's.' " (*Id.* at p. 472.) Our high court rejected the defendant's assertion that the prosecutor mischaracterized the expert's testimony and "misled the jury about the statistical significance of the serological evidence." (*Ibid.*; see *id.* at pp. 473-474.) Highlighting the expert's testimony that "a minuscule portion of the population" would have blood matching the defendant's, the court found it "obvious that the prosecutor was engaged in asking the jury to draw permissible inferences from the evidence." (*Id.* at pp. 474, 473.) The same is true here. The prosecutor acted permissibly in inviting the jury to infer certainty from a miniscule chance that McKinney was not a DNA contributor.

McKinney's analogy to *Miller v. Pate* (1967) 386 U.S. 1 also fails. There, the United States Supreme Court overturned a conviction because the prosecutor sponsored

9

testimony and argued to the jury that stains on a pair of undershorts were blood stains matching the victim's blood type when the prosecutor knew the stains were, in reality, paint. (*Id.* at pp. 3-7.) This sort of "knowing use of false evidence" (*id.* at p. 7) is not like the situation here, where the prosecutor's argument reflected a reasonable characterization of testimony the truth of which has not been challenged.

We reject McKinney's claim of prosecutorial error.

## II.

McKinney next contends that instructional error requires reversal of his convictions on counts 1 and 3.

As noted above, McKinney was charged in count 1 with forcible rape of a child under age 14 (§ 264, subd. (c)(1)) and in count 3 with aggravated sexual assault of a child under age 14 who is seven or more years younger than the perpetrator (§ 269, subd. (a)(1)). Count 3 alleged that McKinney committed the charged assault by forcibly raping the victim. (§§ 261, subd. (a)(2), 269, subd. (a)(1).) The trial court instructed the jury on the charged offenses and their shared lesser included offense of rape. The court did not give any form of attempt instruction.

McKinney asserts that the trial court had a duty to sua sponte instruct the jury on attempted forcible rape of a child and attempted aggravated sexual assault of a child, which he argues are lesser included offenses of the completed crimes. "California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) A court has no sua sponte duty to instruct on an uncharged attempt to commit the charged completed offense unless the attempt is a lesser included offense. (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1247 (*Braslaw*).) " '[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements

10

of the lesser offense, such that the greater cannot be committed without also committing the lesser.' " (*People v. Licas* (2007) 41 Cal.4th 362, 366; see *People v. Bailey* (2012) 54 Cal.4th 740, 748 [describing elements test and accusatory pleading test].) "Where the accusatory pleading, as in this case, tracks the statutory language rather than reciting factual details of the offense, 'only the statutory elements test is relevant in determining if an uncharged crime is a lesser included offense of that charged.' " (*Braslaw*, at p. 1247.) A trial court's failure to instruct on a lesser included offense is reviewable on appeal even if, as here, the defendant fails to request an instruction on the lesser offense. (*Breverman*, at pp. 148-149.) "We determine de novo whether one crime is a lesser included offense of another." (*Braslaw*, at p. 1247; see *Licas*, at p. 366.)

In this case, neither attempted forcible rape nor attempted aggravated sexual assault is a lesser included offense of the completed crime. Forcible rape—which formed the basis of the charges in both counts 1 and 3—is a general intent crime. (§§ 261, subd. (a)(2), 264, subd. (c)(1), 269, subd. (a)(1); *People v. DePriest* (2007) 42 Cal.4th 1, 48.) In contrast, attempt is a specific intent crime. Section 21a provides: "An attempt to commit a crime consists of two elements: a *specific intent* to commit the crime, and a direct but ineffectual act done toward its commission." (Italics added.) Attempted forcible rape thus requires the specific intent to commit forcible rape. (*People v. Lee* (2011) 51 Cal.4th 620, 633.) Attempted aggravated sexual assault likewise requires the specific intent to commit aggravated sexual assault, that is, rape of a child. (*People v. Collins* (2020) 52 Cal.App.5th 627, 632, 634.) Because attempted forcible rape and attempted aggravated sexual assault each requires this additional specific intent element, neither is a lesser included offense of the completed crime. (See *People v. Ngo* (2014) 225 Cal.App.4th 126, 156 ["when the completed offense is a general intent crime, an attempt to commit that offense does not meet the definition of a lesser included offense under the elements test because the attempted offense includes a specific intent element not included in the complete offense"].)

In *People v. Bailey*, *supra*, 54 Cal.4th at page 749, our state Supreme Court concluded that "[u]nder the elements test, attempt to escape is not a lesser included offense of escape since it requires additional proof that the prisoner actually intended to escape." The court explained that attempt is not always a lesser included offense of a given completed crime. (*Id.* at p. 753.) Attempt is not subsumed "where the attempted offense includes a particularized intent that goes beyond what is required by the completed offense." (*Ibid.*) That is the case with the asserted attempt offenses here. (See, e.g., *Braslaw*, *supra*, 233 Cal.App.4th at pp. 1251-1252 [holding attempted rape of an intoxicated person is not a lesser included offense of rape of an intoxicated person]; *People v. Mendoza* (2015) 240 Cal.App.4th 72, 82-83 [attempted sexual intercourse, attempted sodomy, and attempted oral copulation with a child 10 years old or younger are not lesser included offenses of the charged general intent crimes].)

McKinney does not address much of this case law, relying instead on *People v. Collins*, *supra*, 52 Cal.App.5th 627 for the proposition that attempted aggravated sexual assault is a lesser included offense of aggravated sexual assault. *Collins* held that attempted aggravated sexual assault of a child is a crime. (*Id.* at pp. 630, 632, 634.) It did not address whether that crime was a lesser included offense of its completed counterpart. Because McKinney's newly proffered attempt offenses require a mental state that differs from the charged completed offenses, the trial court did not err by not instructing the jury on attempted rape or attempted aggravated sexual assault as lesser included offenses of the crimes charged in counts 1 and 3.

### III.

McKinney's remaining claims challenge the validity of his sentence.

Two months after the trial, at which McKinney represented himself, the trial court appointed counsel to represent him. Counsel filed a motion for a new trial, which was argued at a hearing in December 2022. The court denied the motion at the hearing and then proceeded directly to sentencing. It did not solicit argument on sentencing from

either party before pronouncing McKinney's sentence. The court noted the "negative probation report," the "very serious" and "horrendous" nature of the offense, the aggravating factors, and the likely lasting impact on the victim. It imposed the statutorily prescribed term of 15 years to life in prison for count 3, the aggravated sexual assault offense, and selected it as the principal term. It imposed and stayed determinate upper term sentences of 13 years for the forcible rape offense (count 1) and eight years for the lewd act offense (count 2), explaining that those counts were based on the same set of facts as count 3. Defense counsel made no comment or objection to the sentence pronouncement.

## A.

McKinney contends that he is entitled to resentencing under the ameliorative amendment to section 654 enacted by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441, § 1) (Assembly Bill 518). Under this amendment, effective January 1, 2022, trial courts have discretion to decide which sentence to impose and execute, and which to impose and stay, when a defendant like McKinney has been convicted of different criminal offenses for the same act or omission. (§ 654, subd. (a); *People v. Mani* (2022) 74 Cal.App.5th 343, 379.) Neither the trial court nor the parties mentioned Assembly Bill 518 or the court's discretion under the law as amended.

Because McKinney did not object at sentencing to the trial court's choice of the principal term, the People argue that his current claim under section 654 has been forfeited. Citing *People v. Hester* (2000) 22 Cal.4th 290, 295, McKinney argues that section 654 claims cannot be forfeited by a failure to object below. When *Hester* was decided, former section 654 did not confer any discretion on trial courts; thus, a claim of error under former section 654 was a claim of an "unauthorized sentence" and not subject to forfeiture. (*Hester*, at p. 295; *People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.) The post-*Hester* amendment of section 654 by Assembly Bill 518 appears to change this analysis because, under the current version of the law, a trial court's decision as to what

13

term to stay is discretionary and thus not one that renders a sentence unauthorized. (See *Scott*, at p. 356.)

But even if McKinney's claim is not forfeited, it fails on the merits because nothing in the record affirmatively shows that the trial court misunderstood its sentencing discretion under section 654. "Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing. [Citations.] Defendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) Remand is unnecessary, however, "if the record is silent concerning whether the trial court misunderstood its sentencing discretion. Error may not be presumed from a silent record." (*Id.* at p. 1229.) That is because trial courts are " ' "presumed to have been aware of and followed the applicable law." ' " (*Ibid.*)

McKinney cites, and we have identified, no indication in the record that the trial court believed it was required to select the indeterminate sentence for count 3 as the principal term. McKinney frames Assembly Bill 518 as an ameliorative change in the law that newly applies, retroactively, to his case. But the changes adopted by Assembly Bill 518 had been in effect for nearly one year before McKinney's December 2022 sentencing, so there is nothing retroactive about its application to this case and no suggestion in the record that the court was unaware of the law in effect at the time of sentencing. In addition, the probation report did not advise which terms to impose or stay, and the record contains no written sentencing recommendations from either party. The court did not mention section 654 one way or the other in announcing its sentence. And if anything, the transcript of the sentencing hearing suggests that the court selected the longest term of imprisonment as the principal term because of the "horrendous"

14

nature of the offense.  Nowhere did the court suggest it was imposing the longest term simply because it believed the law required it.  Remand for resentencing is thus unwarranted.

B.

McKinney next contends that he was constructively denied the assistance of counsel at sentencing because his attorney " 'acted as a mere spectator' " at the sentencing hearing.  He argues this resulted in a violation of his Sixth Amendment right to counsel under *United States v. Cronic* (1984) 466 U.S. 648.

McKinney's sentencing proceeding was very brief.  It lasted just 12 minutes, filling fewer than five pages of transcript—three of which consist of the trial court pronouncing judgment and explaining McKinney's appellate rights.  Defense counsel provided three one-word answers to the trial court's preliminary questions and then was silent for the remainder of the hearing.  The prosecutor spoke slightly more, listing some of McKinney's prior convictions at the trial court's request.  Neither party offered or was asked for a recommended sentence; nor does it appear that any sentencing briefs were filed.

Generally speaking, to prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the defendant was prejudiced, meaning there is a reasonable probability the outcome would have been different were it not for counsel's inadequate performance.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)  In *United States v. Cronic*, *supra*, 466 U.S. at page 659, the United States Supreme Court recognized a narrow exception to the prejudice requirement.  As relevant here, prejudice is presumed when there has been a "complete denial of counsel" at a "critical stage" of the proceedings or when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."  (*Ibid.*; *Bell v. Cone* (2002) 535 U.S. 685, 695-696.)  The "attorney's failure must be complete."  (*Cone*, at p. 697.)  It is not enough for a defendant to identify particular omissions "at specific

15

points." (*Ibid.*) The *Cronic* exception to the ordinary requirement to demonstrate prejudice is "very narrow." (*People v. Rices* (2017) 4 Cal.5th 49, 91.)

We conclude that, in light of the limited record on this direct appeal, McKinney has failed to establish that his counsel's omissions fall within that narrow exception. As an initial matter, we reject the People's contention that we should judge defense counsel's performance by looking at the December 2022 hearing as a whole. At that hearing, defense counsel vigorously pressed a motion for a new trial while omitting any argument concerning the appropriate sentence after that motion was denied. In the People's view, counsel's robust advocacy in support of the motion for a new trial is sufficient to show that McKinney received the assistance of counsel at sentencing.

That argument is mistaken. Even though McKinney's sentencing occurred in conjunction with the hearing on his motion for a new trial, the Sixth Amendment still guaranteed him the right to effective counsel with respect to the discrete stage of sentencing. It is well established that sentencing is a "critical stage" of criminal proceedings. (*United States v. Cronic*, *supra*, 466 U.S. at p. 659; *People v. Doolin* (2009) 45 Cal.4th 390, 453.) In *Bell v. Cone*, *supra*, 535 U.S. 685, for example, the high court considered the defendant's *Cronic* claim that defense counsel at the sentencing phase of his capital trial failed to adduce mitigating evidence and waived closing argument. (*Id.* at pp. 690-692.) The Court held that *Cronic* did not apply because the defendant's "argument [was] not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points." (*Id.* at p. 697.) This confirms that a claim like McKinney's—"that his counsel failed to oppose the prosecution throughout the sentencing proceeding" alone (*ibid.*)—is a cognizable *Cronic* claim. (See *People v. Ruiz* (2023) 89 Cal.App.5th 324, 330, fn. 1 [rejecting the People's argument that *Cronic*'s exception "requires a complete failure of counsel throughout the entire trial," noting that "the claim in *Cone* involved counsel's failure only at the sentencing hearing"]; see also *Patrasso v. Nelson* (7th Cir. 1997)

16

121 F.3d 297, 299, 303-305 [granting habeas relief under *Cronic* where counsel made no arguments in mitigation at sentencing immediately after presenting arguments in support of unsuccessful post-trial motion].)

On the present record, however, we cannot conclude that McKinney was constructively denied the assistance of counsel at sentencing. (*United States v. Cronic*, *supra*, 466 U.S. at p. 659.) The burden rests on the defendant to demonstrate a constitutional violation. (*Id.* at p. 658.) Normally, claims of ineffective assistance of counsel are appropriately raised in petitions for a writ of habeas corpus, where relevant facts and circumstances not contained in the record on direct appeal can be adduced. (*People v. Snow* (2003) 30 Cal.4th 43, 111.) Consistent with this principle, the cases McKinney cites all involved habeas proceedings on more fully developed factual records. For example, in *People v. Ruiz*, *supra*, 89 Cal.App.5th at pages 327-328 and 334, the Court of Appeal held in reviewing a consolidated direct appeal and habeas petition that the defendant was constructively denied counsel under *Cronic* when his attorney (who was later revealed to be suffering from a brain tumor at the time) presented no argument on his behalf at a resentencing hearing. The court did not find a *Cronic* violation based purely on the fact that the attorney made no oral or written argument to reduce the defendant's sentence. (*Id.* at p. 332.) Rather, the court relied on declarations from the defendant and the attorney's former secretary submitted with the habeas petition. (*Id.* at p. 328.) The defendant's declaration "provided facts about his own prehearing interaction" with his attorney, showing that the attorney "did nothing before, during, or after the hearing to assist" the defendant. (*Id.* at pp. 331-332.) The secretary's declaration described her employer's cognitive decline at the relevant time, which "strongly indicate[d] there was no tactical reason for [the attorney's] nonexistent advocacy" on the defendant's behalf. (*Id.* at p. 333.)

In *Childress v. Johnson* (5th Cir. 1997) 103 F.3d 1221, 1222, 1231-1232, the court on habeas review overturned a sentence that was enhanced by the defendant's 1940s plea

17

convictions, which the court held had been secured without the assistance of counsel.  In doing so, the court relied on testimony by the defendant and an attorney witness stating that, at the time of the defendant's criminal proceedings in the 1940s, attorneys were appointed solely to waive the right to a jury trial and the defendant's particular attorney "never investigated the facts, never discussed the applicable law with [the defendant], and never advised him of the rights he would surrender by pleading guilty."  (*Id.* at p. 1223.)  Similarly, in *Patrasso v. Nelson*, *supra*, 121 F.3d at page 305, the court held that the defendant's counsel had "effectively abandoned his client at sentencing" where the attorney not only stood silent at the hearing after the prosecutor argued for an aggravated sentence but also affirmatively admitted at an evidentiary hearing held in connection with a post-trial motion that he had performed no investigation of mitigating factors before sentencing.  And in *Lewis v. Zatecky* (7th Cir. 2021) 993 F.3d 994, 999, 1006, the court granted relief under *Cronic* after considering testimony from the defendant's attorney that he had not conducted an investigation or prepared his client before stating at the sentencing hearing that he would defer any arguments to his client.  (See also *Miller v. Martin* (7th Cir. 2007) 481 F.3d 468, 473 (*per curiam*) [granting habeas relief under *Cronic* based on defense counsel's "own admission" in postconviction proceedings that he failed to conduct any research, "offer a shred of mitigating evidence, object to (or consult with his client about) errors in the [presentence report], or even lobby for a sentence lower than the one urged by the State"]; *Tucker v. Day* (5th Cir. 1992) 969 F.2d 155, 159 [granting habeas relief under *Cronic* where defense counsel, who stated he was " 'just standing in' " at resentencing hearing, failed to argue, "did not consult with" the defendant, and "had no knowledge of the facts"].)

No similar evidence appears in the record in this case.  While the transcript of McKinney's sentencing hearing shows that counsel presented no arguments in support of a more lenient sentence, the record on appeal does not allow us to determine whether counsel's silence was the product of considered analysis and strategy or, as McKinney

18

maintains, counsel's effective abandonment of his client. For example, the record contains no testimony or other evidence that counsel failed to conduct relevant research or investigations or to consult with McKinney regarding mitigating factors. Nor does McKinney argue that his counsel possessed new mitigating evidence or testimonials that should have been presented. (Cf. *People v. Ruiz*, *supra*, 89 Cal.App.5th at pp. 332, 334.) Given the testimony of McKinney's multiple character witnesses at trial, defense counsel may have reasonably deemed it unnecessary to reiterate its content. Moreover, unlike in *Patrasso v. Nelson*, *supra*, 121 F.3d at page 303 and *Miller v. Martin*, *supra*, 481 F.3d at page 470 where the prosecutors sought aggravated sentences, the People advanced no sentencing recommendation of their own either before or during McKinney's sentencing. Defense counsel could have reasonably determined that affirmatively arguing for leniency, and thereby potentially inviting rebuttal, would do more harm than good for his client.

It is possible that further development of the factual record will support McKinney's contentions. But based on the record before us, we are unable to conclude solely from the fact that counsel declined to offer argument as the trial court proceeded to pronounce sentence that counsel presumptively abandoned McKinney's cause. While claims of *Cronic* error can prevail on direct appeal where the record establishes a constructive denial of counsel—such as where counsel states on the record the reasons (or lack of reasons) for their advocacy (or lack of advocacy)—the record in this case does not do so. Should McKinney wish to pursue this claim, he may bring a petition for a writ of habeas corpus. (See *People v. Snow*, *supra*, 30 Cal.4th at pp. 113-118 [declining to resolve on direct appeal ineffective assistance claim based on attorneys' waiver of penalty phase arguments in capital case, deferring claim for habeas proceedings].)

C.

McKinney next asserts that he received ineffective assistance of counsel under the standard set forth in *Strickland v. Washington* based on his counsel's failure to urge the

19

trial court to stay his indeterminate sentence under section 654 and to present three arguably mitigating factors.

For the reasons discussed above, we cannot say in this direct appeal that it was deficient performance, as opposed to strategy, for defense counsel not to voice these arguments at sentencing. Even assuming it was deficient, however, McKinney has not shown " 'a reasonable probability the outcome [of his sentencing] would have been different were it not for' " these omissions. (*People v. Woodruff* (2018) 5 Cal.5th 697, 736; see *In re Tellez* (2024) 17 Cal.5th 77, 88 [reviewing court may dismiss ineffective assistance claims solely for lack of prejudice].) Regarding counsel's failure to mention section 654, the trial court's statements at sentencing indicate that it would have selected the highest available term as the principal term even if defense counsel had urged otherwise. The court noted all the factors brought out in the "negative" probation report, the aggravating factors found true by the jury—the victim's particular vulnerability and McKinney's abuse of his position of trust—and called McKinney's acts "such a horrendous offense" likely to "seriously impact[]" the rest of the victim's life. Given these statements, it is not reasonably probable that the court would have chosen to impose and execute one of the shorter determinate terms, even had it been explicitly reminded of its discretion to do so under amended section 654.

Second, McKinney argues his counsel was ineffective for failing to raise three circumstances in mitigation: that McKinney was "a good, loving parent," that he was a hard worker, and that he struggled with alcoholism. All of these circumstances were brought out through the testimony of McKinney's character witnesses, so none of this would have been new information to the trial court. Moreover, even if counsel had reminded the court of this testimony, McKinney has not demonstrated that any of these factors would likely have persuaded it to impose a shorter term. Any argument that McKinney was "a good, loving parent" would be undermined by his conviction of sexually assaulting his daughter. Regarding McKinney's struggle with alcohol, there was

20

no evidence that he was intoxicated on the night he committed the offenses; and he and his character witnesses testified that his periods of heavy drinking did not lead to problems with his parenting. We also see no likelihood that presentation of evidence of McKinney being a hard worker would have led to a different result in light of the aggravated nature of his offense. Accordingly, McKinney's *Strickland* claim of ineffective assistance fails.

## D.

Finally, we reject McKinney's alternative request to remand for an evidentiary hearing pursuant to section 1260 to allow him to further develop his Sixth Amendment challenges to his sentence. (See § 1260 [appellate court "may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances"].) Any further development of the record in support of McKinney's ineffective assistance of counsel claims under *Cronic* or *Strickland* may be pursued in a habeas corpus proceeding. (See *People v. Snow*, *supra*, 30 Cal.4th at pp. 111, 113-118.)

## DISPOSITION

The judgment is affirmed.

　　　　　　　　　　　　　　　　　 /s/　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　 FEINBERG, J.


We concur:


 /s/　　　　　　　　　　　　　
DUARTE, Acting P. J.


 /s/　　　　　　　　　　　　　
BOULWARE EURIE, J.

21